## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLISON LEVERICK and HARRY MOSCATIELLO, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GATEWAY ENERGY SERVICES CORPORATION,<br><br>Defendant. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, Allison Leverick and Harry Moscatiello, by and through their undersigned counsel, Shub Law Firm LLC, Frederick Law Group, PLLC, and Timoney Knox LLP, on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Gateway Energy Services Corporation ("Gateway" or "Defendant"), and allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, allege, upon information and belief based upon, *inter alia*, investigations conducted by their attorneys.

### NATURE OF THIS CASE

1.      This action is brought as a class action on behalf of Plaintiffs and a putative Class of consumers seeking redress for the deceptive, improper, and bad faith pricing practices of Defendant that have caused at least thousands of consumers in New Jersey and other states to pay considerably more for their natural gas and/or electricity than they should otherwise have paid.

2.    Defendant has taken advantage of the deregulation of the retail natural gas and electricity markets in New Jersey and other states by luring consumers into switching energy suppliers with false and deceptive promises that it offers competitive rates.

3.    Furthermore, Defendant makes false contractual promises of a market-based variable rate for natural gas and electricity.

4.    But Defendant's rates are not competitive, nor are they market based. In fact, Defendant's variable rates are substantially higher than those otherwise available from its customers' local utilities in the energy marketplace. As a result, consumers are being fleeced millions of dollars in exorbitant charges for their natural gas and/or electricity.

5.    Plaintiffs, on behalf of the Classes they seek to represent, bring this lawsuit based on Gateway's unlawful and unconscionable consumer practices under the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1 *et seq*. and its violations of the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act, N.J.S.A. § 56:12-15 (the "TCCWNA"), as well as for breach of contract and breach of the implied covenant of good faith and fair dealing. Through its deceptive and unconscionable practices, Gateway bilked the class of thousands of current and former variable rate gas and electric customers out of millions of dollars. Accordingly, this lawsuit seeks, *inter alia*, injunctive relief, actual damages and refunds, treble damages, punitive damages, attorneys' fees, and the costs of this suit.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over all causes of action asserted herein, pursuant to 28 U.S.C. § 1332(d), because the aggregate claims of the Classes exceed the sum or value of $5,000,000.00, and there is diversity of citizenship between the proposed Class members and the Defendant.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2). Defendant's corporate headquarters and principal place of business are in this District and Defendant's deceptive practices occurred in this District.

## PARTIES

8.      Plaintiff Allison Leverick is a citizen of New Jersey residing in Haddonfield, New Jersey. Ms. Leverick was a customer of Gateway's from approximately March 2013 through approximately December 2018 for natural gas and electricity, and as a result of Defendant's deceptive conduct, she incurred excessive charges for her natural gas and electricity.

9.      Plaintiff Harry Moscatiello is a citizen of New Jersey residing in Cranford, New Jersey. Mr. Moscatiello was a customer of Gateway's from approximately December 2012 through approximately March 2015 for electric and from approximately January 2013 through approximately March 2019 for natural gas, and as a result of Defendant's deceptive conduct, he incurred excessive charges for his natural gas and electricity.

10.     Defendant Gateway Energy Services Corporation is a citizen of New York, having been organized under the laws of New York, and with a principal place of business or corporate headquarters in Montebello, New York, located in Rockland County. Gateway has at least thousands of customers in New Jersey and thousands of customers in the other states in which it operates including Kentucky, Maryland, Ohio, Pennsylvania, and Virginia, and tens of millions of dollars in revenues.

## STATEMENT OF FACTS

### A.  Background on Energy Supply Companies ("ESCOs")

11.     Prior to 1997, energy utility companies sold electricity and delivered it through their power lines to individuals and businesses. Thus, consumers did not have a choice to buy energy from alternative suppliers. In 1997, 17 states began to deregulate energy. This supposedly

allowed independent energy supply companies ("ESCOs") to supply energy to homes and businesses at competitive prices. Indeed, one of the primary goals of deregulation was increased competition in the industry, with a focus on achieving greater consumer choice and reduced energy rates.

12.     In an energy deregulation state like New Jersey, the utility company, or "LDC", is not allowed to profit from buying or selling energy. Whatever the energy costs the utility company to produce or procure is what they may charge the customer. It can profit only from the delivery. It owns the wires the energy is sent through and gets paid for the delivery of the energy no matter where it comes from. Of course, utilities still must cover for ordinary operating expenses, such as rent, payroll, supplies, marketing, and overhead. Thus, local utilities cannot simply buy electricity at the wholesale market rate and sell it to their customers at that same rate.

13.     In contrast, ESCOs can profit from buying and selling energy to customers, because they are not subject to the same regulations as utility companies. Thus, deregulation enables energy customers to shop for electric and gas services by separating the supply and delivery portion of these services, and opening up the supply portion to competition from ESCOs. This supposedly enables consumers to shop around for the best price on their energy supplies and in turn, save money on their energy bills.

14.     In deregulated states, ESCOs may compete to supply energy services, but the local public utility companies continue to deliver power through their wires regardless of which company supplies them. In addition, the local public utility may continue to supply metering, billing, and related administrative services to the consumer, regardless of who supplies the energy services. Thus, the public utility continues to generate and send periodic bills directly to the consumer for the energy it supplies, even after a consumer has enrolled in or "switched" to an ESCO. The fact that the energy services for which the customer is being billed for are now being

provided by an ESCO is noted on the bill, often in very fine print that is easily overlooked by a reasonable consumer. The bill otherwise looks substantially the same as it did before the switch.

15.     Although deregulation may increase competition for energy supply services, because there is no regulatory authority over the prices that ESCOs charge their customers, these unregulated suppliers are not required to purchase long-term energy contracts, compared to the local utility companies, which would help insulate residential customers from sharp price fluctuations.

16.     Therefore, ESCOs should be able to offer rates competitive with, or substantially lower than, utilities, and in fact many do. Indeed, Gateway and its parent corporation Direct Energy, offered fixed rates during the time Plaintiffs were Gateway customers that were competitive with or much lower than New Jersey utility rates.

17.     Because the prices they charge their customers are not regulated, ESCOs often choose to offer variable rate contracts, giving them the ability to change their rates to meet market conditions. When market conditions cooperate, an ESCO is able to offer potential customers significant cost savings in order to entice them into enrolling in their services and entering into a contract.

18.     In order to entice customers to enroll in these variable rate plans, however, ESCOs, like Gateway, typically offer initial fixed rate plans with promises of competitive rates and/or savings if the customer switches from his or her local utility to the ESCO. The fixed rate is temporary, and once the fixed rate expires, the ESCO converts the customer to its variable rate plan.

**B.  The Failure of Energy Deregulation and Resulting Harm to Consumers**

19.     Almost all states that deregulated their energy markets did so in the mid- to late-1990s. This wave of deregulation was frantically pushed by then-corporate behemoth Enron. For

example, in December 1996 when energy deregulation was being considered in Connecticut,

"the most aggressive proponent" of deregulation, Enron CEO Jeffrey Skilling, said:

> Every day we delay [deregulation], we're costing consumers a lot of money . . . .
> It can be done quickly.  The key is to get the legislation done fast.[1]

20.     Changing the industry under this sense of urgency and with inadequate

protections against abuse resulted in serious harm to consumers in deregulated states, and has

spawned a return to sensible regulation. The number of full or partially deregulated states has

dwindled to only seventeen and the District of Columbia, down from forty-two states in 2001

that had started to or were considering deregulation. Even some deregulated states have

recognized deregulation's potential harm to everyday consumers and now only allow large-scale

consumers to shop for their energy supplier.

21.     Responding to shocking energy prices often paid by ordinary consumers, many

key supporters of deregulation now regret the role they played. For example, reflecting on

Maryland's failed deregulation experience, a Maryland Senator commented: "Deregulation has

failed. We are not going to give up on re-regulation till it is done."[2]

22.     A Connecticut leader who participated in that state's experiment with energy

deregulation was similarly regretful:

> Probably six out of the 187 legislators understood it at the time, because it is so
> incredibly complex . . . .  If somebody says, no, we didn't screw up, then I don't know
> what world [they] are living in.  We did.[3]

23.     Massachusetts Attorney General Maura Healey has also expressed serious

concerns about deceptive practices of competitive electric suppliers like Gateway. In March

2018, Attorney General Healey issued a report calling for an end to the competitive electricity

---

[1] Christopher Keating, *Eight Years Later ... "Deregulation Failed"* HARTFORD COURANT, Jan. 21, 2007.
[2] David Hill, State Legislators Say Utility Deregulation Has Failed in its Goals, THE WASHINGTON TIMES, May 4, 2011.
[3] Keating, *supra* note 5.

supply market for individual residential customers in Massachusetts, as a result of the false and deceptive promises made by competitive electric suppliers like Gateway: "Competitive electric suppliers promise big energy savings but are actually burdening customers with hundreds of dollars in extra costs."[4]

24.     This class action seeks to recover for residents of New Jersey and all other states except New York[5] for the overcharges incurred by Plaintiffs and the Classes as a result of Gateway's deception.

**C.     The History Of New Jersey's Energy Industry**

25.     In 1999, New Jersey deregulated the market for electricity supply, a major break with past policy. Prior to deregulation, electricity was supplied and distributed solely by local utility companies. Over the last several years, a number of states, including New Jersey, have begun to change the regulations in the energy industry purportedly to enhance competition between energy providers. The theory was that competition would result in ESCOs being more aggressive than the utilities in reducing wholesale purchasing costs, thereby lowering retail residential rates and in turn, saving customers money on their energy bills.

26.     The market for wholesale electricity in New Jersey is under the administration of an independent, not-for-profit corporation formed in accordance with the recommendations of the Federal Energy Regulatory Commission, called PJM Interconnection LLC ("PJM").

---

[4] *See* Report, Office of the Attorney General, Commonwealth of Massachusetts, *An Analysis of the Individual Residential Electric Supply Market in Massachusetts* (March 2018), https://tinyurl.com/Mass-Analysis, at viii.

[5] There is pending litigation in New York state court against Defendant [*Bell v. Gateway Energy Services Corporation*, No. 031168/18 (Sup. Ct. Rockland Cnty., Mar. 1, 2018)] filed on behalf of a New York plaintiff and a class of Gateway's New York natural gas and electricity customers who converted from a fixed rate plan to a variable rate plan. The case is currently pending and awaiting the Court's ruling on class certification. As such, this lawsuit does not cover Gateway's New York customers because those customers are covered under the *Bell* litigation.

27.     PJM coordinates and directs the generation and flow of electricity throughout its regions, including New Jersey, ensuring that electric supply exactly meets demand throughout the network.

28.     PJM manages the market and determines where and when electricity will be made by generation companies and the wholesale prices that will be paid for that electricity through competitive bids.

29.     ESCOs, such as Gateway, have various options to buy electricity at wholesale for resale to retail customers in New Jersey, including: owning electricity production facilities; purchasing electricity from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing electricity in advance of the time it is used by consumers, either by purchasing electricity to be used in the future or by purchasing futures and forward contracts for the delivery of electricity in the future at a predetermined price. The point of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce electricity costs – allowing ESCOs to charge competitive rates in the market.

30.     If a customer switches to an ESCO, his or her energy will be "supplied" by the ESCO, but still "delivered" by their existing utility. The customer's existing utility continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is which company sets the price for the customer's energy supply.

31.     As part of the deregulation plan, ESCOs (like Gateway) are not required to file either their electricity rates or the method by which they set those rates with the New Jersey Board of Public Utilities ("NJBPU").

32.     Gateway's prices are not approved by the NJBPU. Rather, Gateway and other ESCOs set their own rates for supplying energy to consumers. And Gateway, like all other

suppliers, relies upon the local utilities to deliver the energy it purchases in the wholesale market to its customers.

33.    Under New Jersey Law, "Power procured for basic generation service by an electric public utility shall be purchased, at prices consistent with market conditions." N.J.S.A. § 48:3-57(a)(1). Therefore, the rates electric public utilities charge, such as PSE&G who provides basic generation service, must be reflective of market conditions.

34.    New Jersey public utilities, like PSE&G, are required to submit their rates to the NJBPU for approval, and the charges assessed to customers for basic generation service "shall be regulated by the NJBPU." N.J.S.A.  § 48:3-57(a)(1). PSE&G is Gateway's largest competitor per the company's 2017-2018 investor fact book, which states that PSE&G is "New Jersey's largest electric and gas utility." *See* https://tinyurl.com/PSE-GFactbook, at 5. PSE&G currently serves nearly three quarters of New Jersey's population in a service area consisting of a 2,600 square-mile diagonal corridor across the state from Bergen to Gloucester Counties. Indeed, PSE&G is the largest provider of electric service, serving 2.2 million electric customers in more than 300 urban, suburban and rural communities, including the state's six largest cities. *See* https://power2switch.com/utility/pseg/.

35.    Similarly, ESCOs, such as Gateway, do not have unfettered discretion to set their rates as they please in any manner they wish.

**D.    Gateway Violates New Jersey's Retail Choice Consumer Protection Laws**

36.    In 2008, New Jersey adopted a statutory scheme designed to protect consumers from deceptive business practices in the energy industry. *See generally* N.J. Admin. Code § 14:4-7.1 *et seq*. (the "Retail Choice Consumer Protection laws"). The energy industry-specific consumer protection standards were prompted by regulators noticing a failure in the deregulated marketplace arising out of a lack of transparency on the part of ESCOs, as well as a lack of

knowledge on the part of consumers. As a result of the information imbalance, ESCO consumers were often deceived into paying substantially more for electricity supply than they would have if they had continued to receive supply from their utilities, all the while thinking they are getting a better deal.

37.    In order to address the deregulated marketplace's failures, the energy industry-specific consumer protection statutes set forth stringent marketing, disclosure, and contractual requirements for ESCOs.

38.    For example, ESCOs are "prohibited from [m]aking false or misleading advertising claims to a potential residential customer." N.J. Admin. Code § 14:4-7.3(d)(1); *accord* N.J. Admin. Code § 14:4-7.4(n)(1) (same).

39.    This provision is designed to protect customers from precisely the type of predatory behavior in which Gateway indulges but cannot justify.

40.    By falsely promising "competitive" rates, Gateway violates the New Jersey Retail Choice Consumer Protection Laws.

41.    Gateway's deceptive practices emerge from, and attempt to exploit, the deregulation of the electricity supply market in New Jersey. In doing so, Gateway's Agreement and solicitations directly contravene its legal obligations to consumers, including Plaintiffs.

42.    When Gateway promised prospective customers that they would be charged a "competitive" market-based rate, the company knew that its promise was false.

43.    By making promises it does not intend to honor and by engaging in unfair dealings, Gateway subverts the purpose of the deregulation of utilities in New Jersey and prevents its customers from receiving the benefits they were promised by Gateway. In reality, most customers, including Plaintiffs, would be far better off staying with their local utilities or

any other energy supplier than switching to Gateway because all Gateway does is abuse its discretion to charge unreasonable rates to profiteer off its customers.

44.     Instead of benefitting from switching to Gateway, typical customers, like Plaintiffs, lose out – to the tune of hundreds or even thousands of dollars per year. Thus, Gateway deceptively causes its customers to pay considerably more for electricity and natural gas services than they should have and otherwise would have paid.

**E.  Plaintiffs' Experiences on Gateway's Energy Plan**

45.     Gateway engages in a classic bait and switch deception scheme. Gateway lures consumers into switching to its natural gas and/or electricity supply service by offering fixed, teaser rates that are much lower than its regular rates. Once the fixed rate period expires, customers are rolled onto Gateway's variable rate plan where their rates are significantly higher than the local utilities' rates and therefore not competitive.

46.     Plaintiff Leverick and Plaintiff Moscatiello's experiences were typical.

***Plaintiff Leverick***

47.     In approximately March 2013, Defendant solicited Ms. Leverick at her residence via a door-to-door sales representative who promised her a competitive rate and that she would save money if she switched from her local utility, PSE&G, to Gateway.

48.     In March 2013, Defendant mailed to Ms. Leverick a letter reiterating its promise of providing her with competitive natural gas and electricity prices once she switched from her local utility, PSE&G, to Gateway's natural gas and electricity service. Gateway's March 4, 2013 "Welcome Letter" is attached hereto as Exhibit "A". In this Welcome Letter, Gateway specifically stated: "***You have taken your first step toward managing your energy costs*** with one of the most highly regarded energy suppliers in the country"; "[o]nce your account is activated, ***you will benefit from our energy-buying expertise***, while keeping the same reliable

11

service from your utility including delivery of your energy, maintenance, meter reading and

emergency-call assistance"; and, "*[w]e are dedicated to your complete satisfaction by providing*

*you with competitive energy prices, attractive pricing plans* and excellent customer service."

(Emphasis added) Exhibit "A".

      49.     In addition to the welcome letter, Gateway sent Ms. Leverick in the mail the

Terms & Conditions that applied to her energy plans (Exhibit "B").

      50.     The Terms & Conditions provided Ms. Leverick with a 14-day rescissionary

period during which she could rescind the Terms & Conditions prior to its commencement

should she not agree to its terms. During that rescissionary period, the Terms & Conditions

served as a solicitation in which Gateway identified the basis upon which the promised market-

based variable rate would be determined.

      51.     The Terms & Conditions contain a prominent section that represents the manner

in which Gateway promises to set the variable rate for electricity and natural gas:

*Variable-Rate Plan*: The price for all electricity or natural gas sold under our Variable-Rate Plan
is a rate set by us each month based on our evaluation of a number of factors that affect the total
price of electricity or natural gas to a customer. The following description is not exhaustive of all
factors that may influence our pricing decision each month, but it does describe the major
components that influence our analysis in a typical month. Each month our management uses the
information described below, along with numerous other considerations, to determine how low a
price we can charge in the upcoming month.
- We determine the cost of all electricity or natural gas (including, where applicable,
  transmission costs, storage costs, transportation costs and line losses) that we have
  already obtained for delivery to customers in your utility territory for the upcoming
  month. Because we often acquire supply over time in preparation for future delivery
  needs (in an effort to mitigate the volatility in price) and do not acquire all of our required
  electricity or natural gas from the spot market, our supply costs may not directly follow
  spot market prices.
- If additional supplies of electricity or natural gas will be required for the upcoming
  month, we will determine the anticipated cost to acquire such additional supplies from the
  spot market.
- If we expect to have surplus supply for the upcoming month, we evaluate the expected
  income we may receive from selling the surplus. Additionally, with electricity, we may
  expect to have surplus or shortfall in any given hour of the upcoming month. In this case,

we evaluate the expected income or costs that may be incurred by eliminating the surplus or shortfall.

- We evaluate, if known, the prices that your utility and other competitors in your area plan to charge in the upcoming month.
- We evaluate the amount of profit we hope to earn from the sale of electricity or natural gas in your utility territory.
- We evaluate any taxes that must be included in the rate we charge for electricity or natural gas in your jurisdiction.
- From time to time, and as a direct result of sudden or drastic increases in price, we may experience a higher level of cost to supply our customers than we wish to bill our customers in a single period. In these circumstances, we may amortize this expense to our customers over multiple billing cycles.
- The variable rate you will be billed is based on your utility service class.

52.    Gateway's standard Residential Terms & Conditions for the supply of electricity or natural gas to customers in New Jersey, Pennsylvania, Maryland, Virginia, Kentucky, and Ohio, contain substantially similar representations.

53.    Any reasonable consumer would understand based on Gateway's representations in its Agreement that they will receive a price for electricity and natural gas from Gateway based on Gateway's evaluation "of a number of factors that affect the total price of electricity or natural gas including "the prices that your utility and other competitors in your area plan to charge in the upcoming month" to mean that Gateway's variable rate for electricity and natural gas would reflect retail electricity market prices, including local competitors' rates (i.e., the local utility – PSE&G for Ms. Leverick and ).

54.    Moreover, based on Gateway's representations, any reasonable consumer would understand that Gateway's variable rate would be competitive with the rate offered by the local utility.

55.    Based on Gateway's promises, as stated above, Ms. Leverick choose to not rescind Gateway's offer and enrolled in Gateway's natural gas and electricity plan.

56.    Ms. Leverick was initially placed on Gateway's fixed rate plans for electricity and natural gas for one year.

57.     Upon information and belief, Gateway sent Ms. Leverick at least one more letter approximately a few months before her fixed rate plans were about to expire in March 2014, again promising competitive prices.

58.     Upon information and belief, when her fixed rate contracts expired in March 2014, Ms. Leverick's natural gas and electricity service rolled onto Defendant's variable rate plans for the first time. Ms. Leverick was on Defendant's variable rate for electricity and natural gas from approximately March 2014 through December 2018.

59.     While on Gateway's variable rate plans, Ms. Leverick paid as much as five times higher for natural gas and two times higher for electricity than she would have paid had she remained with her local utility, PSE&G, and not made the switch to Gateway.

60.     Thus, Gateway's representation that its rates would be competitive are false, misleading, and deceptive.

61.     Gateway's contractual promises of providing market-based variable rates are also false.

### *Plaintiff Moscatiello*

62.     In approximately November 2012, Defendant solicited Mr. Moscatiello, promising a competitive rate and that he would save money if he switched from his local utilities, PSE&G and Elizabethtown Gas, to Gateway.

63.     On November 9, 2012, Defendant mailed to Mr. Moscatiello a letter reiterating its promise of providing him with competitive natural gas and electricity prices once he switched from his local utilities, PSE&G and Elizabethtown Gas, to Gateway's natural gas and electricity service. Gateway's November 9, 2012 "Welcome Letter" is attached hereto as Exhibit "C". In this Welcome Letter, Gateway specifically stated: "***You have taken your first step toward managing your energy costs*** with one of the most highly regarded energy suppliers in the

country"; "[o]nce your account is activated, *you will benefit from our energy-buying expertise*, while keeping the same reliable service from your utility including delivery of your energy, maintenance, meter reading and emergency-call assistance"; and, "*[w]e are dedicated to your complete satisfaction by providing you with competitive energy prices, attractive pricing plans* and excellent customer service." (Emphasis added) Exhibit "C".

64.     Seven days later, on November 16, 2012, Defendant mailed to Mr. Moscatiello a second letter re-reiterating its promise of providing him with competitive natural gas and electricity prices once he switched from his local utilities, PSE&G and Elizabethtown Gas, to Gateway's natural gas and electricity service. Gateway's November 16, 2012 "Welcome Letter" is attached hereto as Exhibit "D". In this Welcome Letter, Gateway specifically stated: "*We look forward to serving your energy needs and helping you find ways to conserve energy and lower you bill*" and, "*[w]e are dedicated to your complete satisfaction by providing you with competitive energy prices, attractive pricing plans* and excellent customer service." (Emphasis added) Exhibit "D".

65.     In addition to the welcome letters, Gateway sent Mr. Moscatiello in the mail the Terms & Conditions that applied to his energy plans (Exhibit "E").

66.     The Terms & Conditions provided Mr. Moscatiello with a 14-day rescissionary period during which he could rescind the Terms & Conditions prior to its commencement should he not agree to its terms. During that rescissionary period, the Terms & Conditions served as a solicitation in which Gateway identified the basis upon which the promised market-based variable rate would be determined.

67.     The Terms & Conditions contain a prominent section that represents the manner in which Gateway promises to set the variable rate for electricity and natural gas:

*Variable-Rate Plan*: The price for all electricity or natural gas sold under our Variable-Rate Plan is a rate set by us each month based on our evaluation of a number of factors that affect the total price of electricity or natural gas to a customer. The following description is not exhaustive of all factors that may influence our pricing decision each month, but it does describe the major components that influence our analysis in a typical month. Each month our management uses the information described below, along with numerous other considerations, to determine how low a price we can charge in the upcoming month.

- We determine the cost of all electricity or natural gas (including, where applicable, transmission costs, storage costs, transportation costs and line losses) that we have already obtained for delivery to customers in your utility territory for the upcoming month. Because we often acquire supply over time in preparation for future delivery needs (in an effort to mitigate the volatility in price) and do not acquire all of our required electricity or natural gas from the spot market, our supply costs may not directly follow spot market prices.
- If additional supplies of electricity or natural gas will be required for the upcoming month, we will determine the anticipated cost to acquire such additional supplies from the spot market.
- If we expect to have surplus supply for the upcoming month, we evaluate the expected income we may receive from selling the surplus. Additionally, with electricity, we may expect to have surplus or shortfall in any given hour of the upcoming month. In this case, we evaluate the expected income or costs that may be incurred by eliminating the surplus or shortfall.
- We evaluate, if known, the prices that your utility and other competitors in your area plan to charge in the upcoming month.
- We evaluate the amount of profit we hope to earn from the sale of electricity or natural gas in your utility territory.
- We evaluate any taxes that must be included in the rate we charge for electricity or natural gas in your jurisdiction.
- From time to time, and as a direct result of sudden or drastic increases in price, we may experience a higher level of cost to supply our customers than we wish to bill our customers in a single period. In these circumstances, we may amortize this expense to our customers over multiple billing cycles.
- The variable rate you will be billed is based on your utility service class.

68.    Gateway's standard Residential Terms & Conditions for the supply of electricity or natural gas to customers in New Jersey, Pennsylvania, Maryland, Virginia, Kentucky, and Ohio, contain substantially similar representations.

69.    Any reasonable consumer would understand based on Gateway's representations in its Agreement that they will receive a price for electricity and natural gas from Gateway based on Gateway's evaluation "of a number of factors that affect the total price of electricity or natural gas including 'the prices that your utility and other competitors in your area plan to charge in the

upcoming month'" to mean that Gateway's variable rate for electricity and natural gas would reflect retail electricity market prices, including local competitors' rates (i.e., the local utilities – PSE&G and Elizabethtown Gas for Mr. Moscatiello).

70.    Based on Gateway's promises, as stated above, Mr. Moscatiello choose to not rescind Gateway's offer and enrolled in Gateway's natural gas and electricity plan.

71.    Plaintiff was initially placed on Gateway's fixed rate plans for electricity and natural gas for one year. Plaintiff received a fixed rate of $0.09290 per kWh for electricity and a fixed rate of $0.61900 per CCF for natural gas.

72.    Upon information and belief, Gateway sent Mr. Moscatiello at least one more letter approximately a few months before his fixed rate plans were about to expire in December 2013, again promising competitive prices.

73.    Upon information and belief, when his fixed rate contracts expired in December 2013, Mr. Moscatiello's natural gas and electricity service rolled onto Defendant's variable rate plans for the first time. Mr. Moscatiello was on Defendant's variable rate for electricity from approximately December 2013 through March 2015 and for natural gas from approximately December 2013 through March 2019.

74.    While on Gateway's variable rate plans, upon information and belief, Mr. Moscatiello consistently paid *over 200% more* for natural gas and as much as 45% more for electricity than he would have paid had he remained with his local utilities, PSE&G and Elizabethtown Gas, and not made the switch to Gateway.

75.    Thus, Gateway's representation that its rates would be competitive are false, misleading, and deceptive.

76.    Gateway's contractual promises of providing market-based variable rates are also false.

**F.**    **Gateway's Deceptive and Improper Pricing Practices Caused Plaintiffs and Class Members to Pay Exorbitant Energy Prices**

77.    New Jersey public utilities, like PSE&G and Elizabethtown Gas, are required to set market-based rates. *See* N.J.S.A. § 48:3-57(a)(1). Gateway's contract states that all of its customers will receive market-based variable rates for electricity and natural gas, specifically rates that are based on Gateway's "evaluation of a number of factors that affect the total price of electricity or natural gas" stemming from Gateway's evaluation of "the prices that your utility and other competitors in your area plan to charge in the upcoming month." Thus, a reasonable consumer, like Plaintiffs and the Putative Class Members would expect that Gateway's variable rate would at least be competitive with, if not lower than PSE&G's and Elizabethtown Gas's generation rate, because both Gateway and the local utilities purchase electricity and natural gas from generators who sell at wholesale.

78.    PJM runs the wholesale electricity market that generators sell (offer) into, and generators are paid the wholesale price of energy based on the PJM market. Thus, there is simply no reasonable explanation for Gateway's variable rate to always remain consistently and exorbitantly higher than PSE&G's generation rate other than to price gouge its customers and reap exorbitant profits.

79.    Indeed, Gateway's rate should be competitive with, if not beat, PSE&G's and Elizabethtown Gas's rates because, as discussed above, ESCOs, such as Gateway, have various options to buy electricity and natural gas at wholesale for resale to retail customers in New Jersey. The entire point of energy deregulation is to allow ESCOs, like Gateway, to use these and other innovative purchasing strategies to reduce electricity and natural gas costs thereby lowering the electricity and natural gas rates that customers pay.

80.     But instead, Gateway's variable rates always remain substantially higher than PSE&G's and Elizabethtown Gas's rates and were not competitive.

81.     Ms. Leverick ultimately cancelled her electricity and natural gas service, and paid Gateway's variable rate until approximately December 2018. After Ms. Leverick cancelled her service with Gateway, she switched back to PSE&G.

82.     The following table is a representative sampling which identifies the billing periods during the time Ms. Leverick paid Gateway's variable rate, the variable rates Gateway charged Ms. Leverick, and the corresponding rates PSE&G would have charged for electricity and natural gas had Ms. Leverick stayed with PSE&G and not switched to Gateway's plan (which is a reasonable representation of the available rates in the competitive energy marketplace):

**Electricity**

| Billing Period | Gateway's Rate | PSE&G's Rate | |
|---|---|---|---|
| 12/2016-1/2017 | $0.165900/kWh | $0.119090/kWh | 39% |
| 1/2017-2/2017 | $0.165900/kWh | $0.118653/kWh | 40% |
| 2/2017-3/2017 | $0.165900/kWh | $0.120070/kWh | 38% |
| 3/2017-4/2017 | $0.167100/kWh | $0.121934/kWh | 37% |
| 4/2017-5/2017 | $0.176416/kWh | $0.127169/kWh | 39% |
| 5/2017-6/2017 | $0.179900/kWh | $0.126909/kWh | 42% |
| 6/2017-7/2017 | $0.189000/kWh | $0.128155/kWh | 47% |
| 7/2017-8/2017 | $0.196016/kWh | $0.122630/kWh | 60% |
| 8/2017-9/2017 | $0.197500/kWh | $0.116900/kWh | 69% |
| 9/2017-10/2017 | $0.200710/kWh | $0.106875/kWh | 88% |

| | | | |
|---|---|---|---|
| 10/2017-11/2017 | $0.198824/kWh | $0.109832/kWh | 81% |
| 11/2017-12/2017 | $0.190239/kWh | $0.120866/kWh | 57% |
| 12/2017-1/2018 | $0.185567/kWh | $0.123027/kWh | 51% |
| 1/2018-2/2018 | $0.179180/kWh | $0.123470/kWh | 45% |
| 2/2018-3/2018 | $0.203050/kWh | $0.119385/kWh | 70% |
| 3/2018-4/2018 | $0.211100/kWh | $0.116421660/kWh | 81% |
| 4/2018-5/2018 | $0.207914/kWh | $0.123238710/kWh | 69% |
| 5/2018-6/2018 | $0.200390/kWh | $0.123253480/kWh | 63% |
| 6/2018-7/2018 | $0.208741/kWh | $0.121793800/kWh | 71% |
| 7/2018-8/2018 | $0.213100/kWh | $0.118244740/kWh | 80% |
| 8/2018-9/2018 | $0.215233/kWh | $0.115896810/kWh | 86% |
| 9/2018-10/2018 | $0.203721/kWh | $0.107871240/kWh | 89% |
| 10/2018-11/2018 | $0.197100/kWh | $0.107605150/kWh | 83% |

**Natural Gas**

| Billing Period | Gateway's Rate | PSE&G's Rate | |
|---|---|---|---|
| 12/2016-1/2017 | $0.860000/CCF | $0.339597/CCF | 153% |
| 1/2017-2/2017 | $0.882969/CCF | $0.339403/CCF | 160% |
| 2/2017-3/2017 | $0.895000/CCF | $0.339410/CCF | 164% |
| 3/2017-4/2017 | $0.925000/CCF | $0.339431/CCF | 173% |
| 4/2017-5/2017 | $0.947839/CCF | $0.339215/CCF | 179% |
| 5/2017-6/2017 | $0.949000/CCF | $0.339691/CCF | 179% |
| 6/2017-7/2017 | $1.047000/CCF | $0.339159/CCF | 209% |
| 7/2017-8/2017 | $1.100516/CCF | $0.339544/CCF | 224% |
| 8/2017-9/2017 | $1.094667/CCF | $0.339484/CCF | 222% |

| 9/2017-10/2017 | $1.089000/CCF | $0.360559/CCF | 202% |
|---|---|---|---|
| 10/2017-11/2017 | $1.038000/CCF | $0.370016/CCF | 181% |
| 11/2017-12/2017 | $0.988667/CCF | $0.369940/CCF | 167% |
| 12/2017-1/2018 | $0.963333/CCF | $0.369272/CCF | 161% |
| 1/2018-2/2018 | $0.935120/CCF | $0.368937/CCF | 153% |
| 2/2018-3/2018 | $0.982873/CCF | $0.368964/CCF | 166% |
| 3/2018-4/2018 | $1.000000/CCF | $0.368929080/CCF | 171% |
| 4/2018-5/2018 | $1.015476/CCF | $0.368687240/CCF | 175% |
| 5/2018-6/2018 | $1.134597/CCF | $0.368531600/CCF | 208% |
| 6/2018-7/2018 | $1.183538/CCF | $0.368563210/CCF | 221% |
| 7/2018-8/2018 | $1.183538/CCF | $0.369339980/CCF | 220% |
| 8/2018-9/2018 | $1.183538/CCF | $0.369597360/CCF | 220% |
| 9/2018-10/2018 | $1.183538/CCF | $0.355258240/CCF | 233% |
| 10/2018-11/2018 | $1.110998/CCF | $0.349369400/CCF | 218% |
| 11/2018-12/2018 | $1.065184/CCF | $0.349159300/CCF | 205% |

83.     Not only does PSE&G's supply rate serve as the ideal comparator in this case, but PSE&G is also Gateway's primary electric supplier and competitor in Ms. Leverick's service area.

84.     And because the utility is the primary electricity and natural gas supplier and competitor in virtually all utility regions, including in Ms. Leverick's utility region, its rates by definition represent retail electricity and natural gas market pricing.

85.     Battling on the same playing field, Gateway has a tactical advantage over PSE&G in providing lower electricity and natural gas prices to its customers because it can purchase electricity and natural gas from any number of markets using any number of purchasing and hedging strategies. And inevitably, these markets are controlled by suppliers who base their

wholesale rates on the PJM wholesale market price. Therefore, while Gateway's rates may not precisely match PSE&G's rates[6], Gateway's rates should be competitive with and commensurate with – if not lower than – PSE&G's generate rate. But, as evidenced in the table in paragraph 82, *supra*, they are always considerably higher and instead wildly disparate.

86.    That Gateway's rate was substantially higher than the local utility's rate during the entirety of the final 23-24 months that Ms. Leverick was with Gateway, therefore demonstrates that Gateway's rate is not in fact a competitive rate nor a market-based rate. In fact, at one point, Gateway charged Ms. Leverick a rate for electricity that was ***more than 89% higher*** than PSE&G's rate. Moreover, while PSE&G's rate declined from June-July 2017 to September-October 2017, Gateway's rate increased over that three-month period, landing at a rate of $0.200710 per kWh. In addition, Gateway charged Ms. Leverick a rate for natural gas that was at times ***more than five times more than*** PSE&G's rates.

87.    Plaintiff Moscatiello's experience was akin to Plaintiff Leverick's – getting price gouged by Gateway to the tune of thousands of dollars.

88.    Mr. Moscatiello ultimately ended his electricity in approximately March 2015 and ended his natural gas service in March 2019, paying Gateway's rates until those dates.

89.    Upon information and belief, Gateway's rate was substantially higher than the local utilities' rate during the entirety of the time that Mr. Moscatiello was with Gateway for natural gas and electricity, demonstrating that Gateway's rate is not in fact a competitive rate nor a market-based rate. In fact, from December 2014 to February 2015, while PSE&G's rate decreased from $0.113078/kWh to $0.110864/kWh to $0.110224/kWh, Gateway's rate increased in these same months from $0.1499/kWh to $0.1583/kWh to $0.1599/kWh, charging Mr. Moscatiello a rate for electricity that was ***45% higher than*** PSE&G's rate. Moreover, while

---

[6] Because, after all, PSE&G's price may include a retail margin. *See* N.J.S.A. § 48:3-57.

PSE&G's rate declined from $0.116404/kWh in March 2014 to $0.111917/kWh in May 2014, Gateway's rate increased, landing at a rate of $0.1590/kWh, which is *42% higher* than PSE&G's rate.

90.     In addition, Gateway charged Mr. Moscatiello a rate for natural gas that, upon information and belief, was ***consistently 200% higher*** than Elizabethtown Gas's rates. Gateway's rate increased over a sixth month period as follows: $0.9266/CCF in February 2018; $0.9278/CCF in March 2018; $0.9755/CCF in April 2018; $0.9835/CCF in May 2018; $1.0536/CCF in June 2018; $1.1581/CCF in July 2018, and remaining at that rate until October 2018. Upon information and belief, Mr. Moscatiello paid rates ***consistently 200% higher*** than Elizabethtown Gas's rates.

91.     And because the utilities are the primary electricity and natural gas suppliers and competitors in virtually all utility regions, including in Mr. Moscatiello's utility region, their rates by definition represent market-based electricity and natural gas market pricing.

92.     Battling on the same playing field, Gateway has a tactical advantage over PSE&G and Elizabethtown Gas in providing lower electricity and natural gas prices to its customers because it can purchase electricity and natural gas from any number of markets using any number of purchasing and hedging strategies. And inevitably, these markets are controlled by suppliers who base their wholesale rates on the PJM wholesale market price. Therefore, while Gateway's rates may not precisely match PSE&G's rates[7] and Elizabethtown Gas's rates, Gateway's rates should be competitive with and commensurate with – if not lower than – PSE&G's and Elizabethtown Gas's generate rate. But, as evidenced in paragraphs 89-90, *supra*, they are always considerably higher and instead wildly disparate.

---

[7] Because, after all, PSE&G's price may include a retail margin. *See* N.J.S.A. § 48:3-57.

93.     A reasonable consumer would understand that the price the local utility charges is indicative of a market-based rate in the competitive energy marketplace and that a "competitive" market-based rate would be consistent with the price charged by the local utility. However, Gateway's prices are substantially higher than local utilities' rates and not competitive.

94.     Thus, Defendant's statements and omissions regarding its natural gas and electricity rates are materially misleading because consumers do not receive a competitive market-based rate. Instead, consumers are charged rates that are substantially higher.  Defendant fails to disclose this material fact to its customers.

95.     Defendant's identification of "profit" amongst the factors it considers does not justify its outrageously high rates. A reasonable consumer might understand that an ESCO will attempt to make a reasonable profit by selling consumers retail electricity. However, such a consumer would also expect that such profits would be consistent with profit margins obtained by other suppliers of electricity or natural gas in the market, and also that Defendant's profiteering at the expense of its customers would not be so extreme that its rate bears no relation to market prices but is instead outrageously higher.

96.     Defendant's misstatements and omissions caused injury to Plaintiffs because they believed that by switching from PSE&G and Elizabethtown Gas to Defendant's natural gas and electricity plans, that their rates would be competitive with the market. Plaintiffs would not have enrolled in Gateway's plans but for its false representations. Had Plaintiffs known that the rates they would be charged by Gateway would be substantially higher than their local utility providers, they would not have made the decision to switch.

97.     Gateway knows full well that it charges a rate that is unconscionably high and not competitive, and that the misrepresentations it makes with regard to the rate being competitive and/or market-based were made for the sole purpose of inducing consumers to sign up for

Gateway's natural gas and/or electricity supply so that it can reap outrageous profits to the direct detriment of consumers without regard to the consequences that high utility bills cause such consumers. As such, Defendant's actions were actuated by actual malice or accompanied by wanton and willful disregard for consumers' well-being.

98.    Similarly, other Class members have routinely paid substantially more for their energy supplies since switching to Gateway's natural gas and/or electricity plans.

99.    Defendant's violations of the law are applicable to all members of the Class, and Plaintiffs are entitled to have Defendant enjoined from engaging in illegal and deceptive conduct in the future.

## ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

100.    Plaintiffs were diligent in bringing this action.

101.    Defendant wrongfully concealed material facts regarding the calculation of its Variable Rate in its monthly billing statements to Plaintiffs. As a result, Plaintiffs were ignorant of their causes of action against Gateway.

102.    Defendant knowingly and actively misrepresented the variable rate calculations in each and every one of Plaintiffs' subsequent billing statements. Had Defendant not concealed the true nature of its Variable Rate, Plaintiffs would have been on notice of the violation.

103.    The information regarding Defendant's calculation of its Variable Rate was at all times exclusively within Gateway's possession and control.

104.    Defendant's own documents, as described herein, indicate that it affirmatively misled Plaintiffs and class members regarding how its Variable Rate is calculated.

105.    In the face of this evidence, Defendant continues to deny that it misrepresents its variable rate billing, perpetuating its concealment.

106.    A reasonable consumer in these circumstances would have been unaware of the existence of their cause of action against Defendant.

107.    Accordingly, Defendant is estopped from relying on any statutes of limitation or repose due to its acts of concealment. Defendant knowingly misled consumers as to the true nature of its Variable Rate. Defendant knowingly concealed and maintained exclusive control over information concerning the variable rate calculation; Plaintiffs and class members, therefore, could not have reasonably known the method of calculating Gateway's Variable Rate. Thus, Defendant is estopped from relying on any statutes of limitations or repose that might otherwise be applicable to the claims asserted herein.

## CLASS ALLEGATIONS

108.    Plaintiffs bring this action on their own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all Gateway customers in New Jersey, Pennsylvania, Maryland, Virginia, Kentucky, and Ohio, who were on a fixed rate plan at any time and were converted to a variable rate plan for natural gas and/or electricity services from the beginning of any appliable limitations period through the date of class certification (the "Multi-State Class").

109.    Plaintiffs also bring this action on their own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a subclass of New Jersey Gateway customers who were on a fixed rate plan at any time and were converted to a variable rate plan for natural gas and/or electricity services from the beginning of any applicable limitations period through the date of class certification (the "SubClass")

110.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Classes may be expanded or narrowed by amendment or complaint.

111.    Excluded from the Multi-State Class and Subclass (the "Classes") are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which any Defendant has or had a controlling interest, or which Defendant otherwise control or controlled; and any officer, director, legal representative, predecessor, successor, or assignee of a Defendant.

112.    This action is brought as a class action for the following reasons:

a. The Classes consist of thousands of persons and are therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

b. There are questions of law or fact common to the Classes that predominate over any questions affecting only individual members, including:

i. whether Defendant violated state consumer protection laws;

ii. whether Defendant violated N.J.S.A. 56: 8-1 *et seq*.;

iii. whether Defendant breached its contract with its customers by charging variable rates not based on the specified factors;

iv. whether Defendant breached the covenant of good faith and fair dealing by exercising its unilateral price-setting discretion in bad faith, i.e., to price gouge;

v. whether Defendant violated the Truth-In-Consumer Contract, Warranty, and Notice Act "TCCWNA";

vi. whether Plaintiffs and the Classes have sustained damages and, if so, the proper measure thereof; and

vii. whether Defendant should be enjoined from continuing to charge variable rates not market-based;

c. The claims asserted by Plaintiffs are typical of the claims of the members of the Classes;

d. Plaintiffs will fairly and adequately protect the interests of the Classes, and Plaintiffs have retained attorneys experienced in class and complex litigation, including class litigation involving consumer protection and ESCOs;

e. Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendant;

f. Defendant has acted on grounds that apply generally to the Classes, namely representing that its variable rates are market-based and "competitive" with the local utilities' rates when Defendant's rates are in fact substantially higher, such that final injunctive relief prohibiting Defendant from continuing its deceptive practices is appropriate with respect to the Classes;

g. A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

i. Absent a class action, Class members as a practical matter will be unable to obtain redress, Defendant's violations of its legal obligations will continue without remedy, additional consumers and purchasers will be harmed, and Defendant will continue to retain its ill-gotten gains;

ii. It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions;

iii. When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the Classes;

iv. A class action will permit an orderly and expeditious administration of claims, foster economies of time, effort, and expense and ensure uniformity of decisions;

v. The lawsuit presents no difficulties that would impede its management by the Court as a class action; and

vi. Defendant has acted on grounds generally applicable to Class members, making class-wide monetary and injunctive relief appropriate.

113.    Defendant's violations of N.J.S.A. 56: 8-1 *et seq*. are applicable to all members of the Subclass, and its violations of the common law are applicable to all members of the Multi-State Class, and Plaintiffs are entitled to have Defendant enjoined from engaging in illegal and deceptive conduct in the future.

## CLAIMS FOR RELIEF

### COUNT I
### (Violation of N.J.S.A. 56: 8-1 *et seq*. on behalf of the Subclass)

114.    Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

115.    The Consumer Fraud Act prohibits, *inter alia*:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise. . . .

N.J.S.A. § 56:8-2.

116.    Defendant's misrepresentations and false, deceptive, and misleading statements and omissions with respect to the rates it charges for electricity and natural gas, as described above, constitute affirmative misrepresentations in connection with the marketing, advertising, promotion, and sale of electricity and/or natural gas in violation of the Consumer Fraud Act.

117.    Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to purchase natural gas and/or electricity from Defendant.

118.    Defendant also failed to inform customers that its variable rates for natural gas and/or electricity are substantially higher than those offered by their local utility and thus not competitive with rates available in the energy marketplace. That information would have been material to any consumer deciding whether to purchase natural gas and/or electricity from Defendant.

119.    Defendant knew at the time it promised its prospective customers that they would be charged a competitive variable rate that was market-based that this promise was false.

120.    Defendant mispresented in its renewal and welcome letters that its rates were "competitive" when in the fact, they were not. Each letter sent by Defendant stating that Defendant's rates will be "competitive" is a violation of the CFA. Defendant continued to violate the CFA by continuing to send out letters to Plaintiffs and members of the Subclass from, upon information and belief, as early as 2010 through the present mispresenting that its rates would be "competitive" when they were not.

121.    Defendant made these false, deceptive, and misleading statements and omissions with the knowledge and intent that consumers rely upon such statements.

122.    Defendant's intentional concealments are designed to deceive current and prospective variable rate customers into believing that its rates will be competitive and also market-based and the specified factors set forth in Defendant's Terms & Conditions. By concealing its actual pricing strategy (i.e., maximizing price gouging), Defendant benefits from reliance and deprives consumers from informed purchasing decisions and savings.

123.    Defendant's affirmative conduct and omissions constitute unlawful practices beyond a mere breach of contract. Rather, Defendant's practices are unconscionable and outside the norm of reasonable business practices.

124.    Plaintiffs and the other members of the Subclass entered into agreements to purchase electricity and/or natural gas from Defendant for personal use and suffered ascertainable loss as a direct and proximate result of Defendant's actions in violation of the Consumer Fraud Act.

125.    As a consequence of Defendant's wrongful actions, Plaintiffs and the other members of the Subclass suffered an ascertainable loss of monies based on the difference in the rates they were charged versus the rates they would have been charged had Defendant charged competitive market-based rates and the factors, as specified in its Terms & Conditions, or had they not switched to Defendant from their previous utility provider.

126.    Plaintiffs and the other members of the Subclass suffered an ascertainable loss caused by Defendant's misrepresentations and omissions because they would not have entered into agreements to purchase natural gas and/or electricity from Defendant if the true facts concerning its rates had been known.

127.    By reason of the foregoing, Defendant is liable to Plaintiffs and the other members of the Subclass for trebled compensatory damages, punitive damages, attorneys' fees, and the costs of this suit. N.J.S.A. §§ 56:8-2.11, 8-2.12, 8-19.

128.    Defendant knows full well that it charges a rate that is unconscionably high, and the misrepresentations it makes with regard to the rate being "competitive" and market-based are made for the sole purpose of inducing consumers to sign up for Gateway's electricity and/or natural gas supply so that it can reap outrageous profits to the direct detriment of New Jersey consumers without regard to the consequences that high utility bills cause such consumers. As such, Defendant's actions are unconscionable and actuated by bad faith, lack of fair dealing, actual malice, or accompanied by wanton and willful disregard for consumers' well-being.

Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

129.    As a result of Defendant's breach, Defendant is liable to Plaintiffs and other Subclass members for actual damages in an amount to be determined at trial and attorneys' fees.

## COUNT II
### (Violation of Materially Identical State Consumer Protection Statutes on Behalf of the Multi-State Class)

130.    Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

131.    Defendant is engaged in trade and commerce as it supplies electricity and/or natural gas to residential customers in New Jersey, Pennsylvania, Maryland, Virginia, Kentucky, and Ohio.

132.    Defendant's representations that its variable rates were (1) competitive; and (2) market-based, when they were not, were material to a reasonable consumer and likely to affect consumer decisions and conduct.

133.    Defendant has used and employed unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

134.    Defendant's acts and practices are immoral, unethical, oppressive and unscrupulous.

135.    Defendant's conduct is substantially injurious to consumers. Such conduct has, and continues to cause, substantial injury to consumers because consumers would not have signed up for Defendant's variable rate plan but for Defendant's misrepresentation that its variable rates were (1) competitive; and (2) market based. Consumers have thus overpaid for the electricity and/or natural gas from Defendant, and such injury not outweighed by any countervailing benefits to consumers or competition.

136.    No benefit to consumers or competition results from Defendant's conduct. Since reasonable consumers are deceived by Defendant's representations and injured as a result, consumers could not have reasonably avoided such injury.

137.    The foregoing unfair and deceptive practices directly, foreseeably and proximately caused Plaintiffs and the Multi-State Class to suffer an ascertainable loss when they paid variable rates that were not competitive and above market-based rates.

138.    The practices discussed above all constitute unfair competition or unfair, unconscionable, deceptive, or unlawful acts or business practices in violation of at least the following state consumer protection statutes:

    (a) **New Jersey Consumer Fraud Act,** N.J. Stat. Ann. § 56:8-1 *et seq.*;

    (b) **Pennsylvania Unfair Trade Practices and Consumer Protection Law,** 73 P.S. §§201-1, *et seq.*;

    (c) **Maryland Consumer Protection Act,** Commercial Law Art. Md. Ann. Code, §§ 13-101 *et seq.*;

    (d) **Virginia Consumer Protection Act,** Va. Code Ann §§ 59.1-196 *et seq.*;

    (e) **Kentucky Consumer Protection Act,** Ky. Rev. Stat. Ann. §§ 367.110 *et seq.*; and

    (f) **Ohio's Consumers Sales Practice Act,** Ohio Revised Code § 1345 *et seq.*

139.    Defendant mispresented in its renewal and welcome letters that its rates were "competitive" when in the fact, they were not. Each letter sent by Defendant stating that Defendant's rates will be "competitive" is a violation of the consumer protection statutes involved herein. Defendant continued to violate the consumer protection statutes invoked herein by continuing to send out letters to Plaintiffs and members of the Multi-State Class from, upon information and belief, as early as 2010 through the present mispresenting that its rates would be "competitive" when they were not.

140. The foregoing unfair and deceptive practices directly, foreseeably and proximately caused Plaintiffs and the Multi-State Class to suffer an ascertainable loss when they variable rates that were not competitive and above market-based rates.

141. Plaintiffs and the Multi-State Class are entitled to recover damages and other appropriate relief, as alleged below.

## COUNT III
### (Breach of Contract on behalf of the Multi-State Class)

142. Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

143. Upon information and belief, Gateway customers in the Multi-State Class have customer agreements whose variable rate terms are substantially similar.

144. Plaintiffs and the other members of the Class entered into valid contracts with Defendant for the provision of natural gas and/or electricity.

145. Pursuant to the Agreement, Defendant agreed to charge a market-based variable rate for electricity and/or natural gas based on in particular, the prices charged by local utility companies in the marketplace.

146. Pursuant to the Agreement, Plaintiffs and the other members of the Class paid the variable rates charged by Defendant for natural gas and/or electricity.

147. However, Defendant failed to perform its obligations under the Agreement to charge market-based rates. Indeed, Defendant charged a variable rate for electricity and/or natural gas that was untethered from the factors upon which the parties agreed the rate would be based.

148. Plaintiffs and the other members of the Class were damaged as a result because they were billed for and paid for a rate for natural gas and/or electricity that was higher than it would have been had Defendant based its rates on the agreed upon factors.

149.     By reason of the foregoing, Defendant is liable to Plaintiffs and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

## COUNT IV
### (Breach of Implied Covenant of Good Faith and Fair Dealing on behalf of the Multi-State Class)

150.     Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

151.     Every contract contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract. The implied covenant is an independent duty and may be breached even if there is no breach of a contract's express terms.

152.     Under the contract, Defendant had unilateral discretion to set competitive, market-based variable rates for natural gas and/or electricity, and other factors, such as the amount of profit Defendant hoped to earn from the sale of natural gas and/or electricity in a customer's utility area.

153.     Plaintiffs reasonably expected that the variable rates for natural gas and/or electricity would, notwithstanding Defendant's profit goals, would be competitive and reflect the rates otherwise available in the energy marketplace, including local utilities' rates, for natural gas and electricity and that Defendant would refrain from price gouging. Without these reasonable expectations, Plaintiffs and other members of the Class would not have agreed to buy natural gas and/or electricity from Defendant.

154.     Defendant breached the implied covenant of good faith and fair dealing by arbitrarily and unreasonably exercising its unilateral rate-setting discretion to price gouge and frustrate Plaintiffs and other Class members' reasonable expectations that the variable rates for natural gas and/or electricity would be competitive and market-based.

35

155.    As a result of Defendant's breach, Defendant is liable to Plaintiffs and other members of the Class for actual damages in an amount to be determined at trial and attorneys' fees.

### COUNT V
**(Violation of the Truth-In-Consumer Contract, Warranty, and Notice Act "TCCWNA", N.J.S.A. § 56:12-15, on behalf of the SubClass)**

156.    Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

157.    Plaintiffs and those similarly situated are "consumers" within the meaning of N.J.S.A. § 56:12-15.

158.    Defendant is a "seller" within the meaning of N.J.S.A. §§ 56:12-15 and -17.

159.    Defendant violated the TCCWNA with respect to Plaintiffs and the SubClass by inducing Plaintiffs and the members of the Putative SubClass to switch electric suppliers to Defendant using tactics that violate the CFA, as alleged above and in Count I. Thus, Defendant violated Plaintiffs' and the Putative SubClass Members' clearly established legal rights or responsibilities of Defendant under the CFA and, therefore, Defendant violated the TCCWNA.

160.    As a result of Defendant's violations of the TCCWNA, Plaintiffs and those similarly situated are entitled to statutory damages of not less than $100 for each of Defendant's TCCWNA violations, as provided by N.J.S.A. § 56:12-17.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)    Issue an order certifying the Classes defined above, appointing the Plaintiffs as Class representatives, and designating their attorneys as Class Counsel;

(b)    Find that Defendant has committed the violations of law alleged herein;

(c)    Enter an order granting monetary relief and actual damages on behalf of the Classes;

(d)    Enter an order granting all appropriate relief on behalf of the Classes;

(e)    Render an award of compensatory damages, the amount of which is to be determined at trial;

(f)    Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(g)    Grant all such other relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial on all issues so triable.

Dated: February 24, 2021                         Respectfully Submitted By:

**SHUB LAW FIRM LLC**

*/s/ Jonathan Shub*
Jonathan Shub (N.Y. Bar # 4747739)
Kevin Laukaitis*
134 Kings Hwy. E., 2nd Floor
Haddonfield, NJ 08033
Tel: (856) 772-7200
Fax: (856) 210-9088
jshub@shublawyers.com
klaukaitis@shublawyers.com

Troy M. Frederick*
Beth A. Frederick *
**FREDERICK LAW GROUP, PLLC**
836 Philadelphia Street
Indiana, PA 15701
Tel: (724) 801-8555
Fax: (724) 801-8358
TMF@FrederickLG.com
BAF@FrederickLG.com

Keith T. Vernon*
Andrew Knox*
**TIMONEY KNOX, LLP**
1717 K Street, NW, Suite 900
Washington, DC 20006
KVernon@timoneyknox.com
aknox@timoneyknox.com

*_Pro Hac Vice_ Application
Forthcoming

_Attorneys for Plaintiffs and
the Proposed Classes_